As an initial matter, I do not believe the majority's statement of the occasion at which Barr spoke, accurately conveys what the complaint alleges.  According to the complaint, Barr met with employees of Transitional, a company recently acquired by Vencor, who were being laid off for reasons unrelated to the Budget Act. "Barr told [the employees] that they probably would have been laid off anyway because the proposed Medicare regulations were going to make it difficult for Vencor to make money and stay profitable." J.A. at 130.  Having cleared that up, I do not think that statement can be reasonably said to give rise to a strong inference.  The statement is not the product of a reasoned report or analysis.  Rather, the statement is from an executive attempting to let unhappy employees down easy. Similarly, that the president of an organization to which Vencor belonged testified in April of 1997 that its members were concerned about some of the proposals in the Bill is of little significance.  At that time the final form of the Act was not yet certain--as I noted earlier, the Bill had gone through several changes--and its passage was also uncertain.  How then, could Vencor predict what the final version of the Act would look like or how that version would affect its revenue? Finally, I find unconvincing the argument that defendants had actual knowledge of the false or misleading nature of their statements because of their sale of stock.  Combined, the defendants' ownership of stock during the class period decreased by less than five percent.  *See* J.A. at 553. Moreover, during the class period, they purchased stock as well.  Sale of stock is not evidence of scienter unless it is "unusual in scope or timing." *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000); *see also In re Comshare, Inc. Securities Litg.*, 183 F.3d 543, 553 (6th Cir. 1999).  Here plaintiffs have made no allegation that the amount sold by defendants was not in line with prior practices.  Consequently, the allegations of executive sales do not give rise to a strong inference of actual knowledge.  *See Oran*, 226 F.3d at 290.

For all of the foregoing reasons, I dissent.  I concur in the dismissal of the remaining claims.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0179P (6th Cir.)
File Name: 01a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

A. CARL HELWIG, on Behalf of Himself and All Others Similarly Situated; GARY BARNES; MEREDITH WILSON BROWN; ROBERT BROWN; S. KAY LUTES; SYBIL R. MEISEL; BARBARA E. SHUSTER,

     *Plaintiffs-Appellants,*

     v.

VENCOR, INC.; W. BRUCE LUNSFORD; W. EARL REED, III; MICHAEL R. BARR; THOMAS T. LADT; JILL L. FORCE; JAMES H. GILLENWATER, JR.,

     *Defendants-Appellees.*

No. 99-5153

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 97-00835—Charles R. Simpson, III, Chief District Judge.

Argued: December 6, 2000

Decided and Filed: May 31, 2001

1

Before:  MARTIN, Chief Judge; MERRITT, KENNEDY, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**   Kenneth J. Vianale, MILBERG, WEISS, BERSHAD, HYNES & LERACH, Boca Raton, Florida,  for Appellants. Gregory P. Joseph, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, for Appellees. **ON BRIEF:** Kenneth J. Vianale, MILBERG, WEISS, BERSHAD, HYNES & LERACH, Boca Raton, Florida, James F. Milliman, Charles G. Middleton, III, MIDDLETON & REUTLINGER, Louisville, Kentucky, David Kessler, SCHIFFRIN & BARROWAY, Bala Cynwyd, Pennsylvania, Arthur R. Miller, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellants.  Gregory P. Joseph, David B. Hennes, Kirsa Phillips, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, David B. Tachau, TACHAU, MADDOX, HOVIOUS & DICKENS, Louisville, Kentucky, for Appellees.  Jacob H. Stillman, Luis DeLaTorre, Eric Summergrad, U.S. SECURITIES AND EXCHANGE, Washington, D.C., for Amicus Curiae.

MERRITT, J., delivered the opinion of the court, in which MARTIN, C. J., DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, JJ., joined.  KENNEDY, J. (pp. 42-52), delivered a separate dissenting opinion, with BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, JJ., joining in Judge KENNEDY's dissent.

law on August 5, 1997.[2]   The conclusion by analysts regarding management's feelings, which they did not attribute to any particular executive, was made on September 25, 1997. Even had they occurred at the same time, I hardly think that an appropriate reading of them is that Vencor was representing *it knew of no way the Budget Act could adversely affect its operations*.  The only reasonable reading would be that, just as it said, Vencor was not certain of the effect-- positive or negative--of the Act and therefore had not included the Act in its projections.

Proceeding from this more reasonable reading of the statements, I do not think the allegations to which the majority points give rise to a strong inference that management actually knew its statements were false or misleading.  The majority points to three allegations in the complaint: (1) that in April of 1997, the president of the Federation of American Health Systems testified that the members of his organization, which included Vencor, were concerned about the effects the legislation might have, (2) "Barr told employees in June of 1997 that they would be laid off because of the impact of the Budget Act and the 'tough times coming' that 'were going to make it difficult for Vencor to make money and stay profitable,'" Maj. Op. at 26, and (3) that Reed sold three million dollars worth of stock.

_____

[2] The 10-Q warned, "Congress is currently considering various proposals which could reduce expenditures under certain government health and welfare programs, including Medicare and Medicaid. Management cannot predict whether such proposals will be adopted or if adopted, what effect, if any, such proposals would have on its business." J.A. at 285.  As indicated, the filing is for the quarter ending June of 1997; the signature sheet, however, is dated July 25, 1997.  Thus, the filing was for a period ended almost two months before the conference report was printed and was signed four days prior to the report.

It seems to me that we have to look at the statement in terms of the quarter for which it was intended--the quarter ending June of 1997--rather than the date on which it was signed.  Anyone reading the statement should know that the analysis was made prior to the end of that quarter. The majority completely disregards the fact that the statement in the 10-Q was made in relation to a quarter that ended in June of 1997.

Second Circuit allows liability to attach when (1) management intentionally fostered a mistaken belief concerning a material fact that was incorporated into a report or (2) management adopted the report. I do not quarrel with that statement of Second Circuit law nor do I think it inconsistent with what we originally said. The complaint says that the analysts' report attributes statements to individuals; however, the text of the report makes clear that it does not. Nor does the report say that management even said it was comfortable with the projections. Rather, the report says, "Management comfortable with EPS [estimates] . . . . We have been in contact with the company this week to review our models." J.A. at 856. Because the report does not indicate with whom the analysts spoke and does not attribute the statement to management, I do not think that the complaint meets the pleading requirement under the Second Circuit case law. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). As we said in the original panel opinion, analysts do not just regurgitate what management tells them, rather they do just what their title suggests: they analyze.

### B.  Strong Inference

Adoption of the reports and the materiality of the statements and omissions aside, the majority has not convinced me that plaintiffs have alleged facts giving rise to a strong inference that management knew the statements were false or misleading. According to the majority, Vencor's statements were false or misleading because, "[w]hen defendants disclaimed any ability to predict health care legislation, while persisting in favorable earnings estimates seven weeks after the enactment of the Budget Act, Vencor was representing that it knew of no way the Budget Act could adversely affect its operations." Maj. Op. at 25.

I do not think that is a precise statement of the facts and, moreover, I find that conclusion to be quite a leap. Management statements concerning the legislation were made on July 25, 1997, before the conference committee report was released on July 29 and before the legislation was signed into

### OPINION

MERRITT, Circuit Judge. The complaint in this securities class action features allegations of insider trading, fraudulent omissions, and inflated stock prices punctured by bad news in the health care industry. The principal issues on appeal arise under the new pleadings standard created by the Private Securities Litigation Reform Act of 1995. As often is the case in suits for securities fraud, we must deal with controverted inferences of knowledge and intent to defraud from facts that give rise to more than one interpretation. How to steer a course between indulging strike suits and predatory allegations on the one hand and deterring meritorious claims on the other: This has been the work of Congress and a number of our sister circuits. The fruit of their efforts has been a statute containing general language at a high level of abstraction, an ambiguous legislative history, and a triparted split among the circuit courts. We conclude that plaintiffs here have stated a claim for securities fraud by creating—in the words of the statute—a "strong inference" that defendants projected financial well-being at a time when they had actual knowledge that their statements were false or misleading, while knowingly omitting material facts that would have tempered their optimism. Accordingly, the judgment of the district court will be REVERSED and the case REMANDED for further proceedings.

An outline of our discussion of the issues is as follows:

I.    Facts
II.   The Private Securities Litigation Reform Act
      A.   The Safe Harbor
      B.   The Pleading Standard
III.  Plaintiffs' Allegations Concerning the Effect of the Balanced Budget Act
      A.   Vencor's Forward-Looking Statements
           1.   Materiality

  2. Actual Knowledge of Misleading or False Nature
  3. Not Identified as Forward-Looking / Absence of Meaningful Cautionary Statements
 B. Sufficiency of Plaintiffs' Complaint
 C. Response to the Dissent
IV. Other Claims
 A. Vencor's Acquisition of TheraTx
 B. Vencor's Acquisition of Transitional Hospitals Corporation
 C. Vencor's Proposed Sale of Behavioral Healthcare Corporation
V. Conclusion

## I. FACTS

The factual allegations of this case are more fully described in section III of the opinion after a discussion of the pleading standard to be applied under the new Act. We will recite only the most salient details here. At the time of the events in suit, defendant Vencor, a company then traded on the New York Stock Exchange, was said to be the largest full-service long-term health care provider in the United States, focusing on hospital and nursing services. Six of its directors are also named as defendants. Plaintiffs are a class of investors in Vencor. They allege a number of misstatements and material omissions by Vencor calculated to artificially balloon stock prices and defraud purchasers. A divided panel of this court concluded that plaintiffs failed to state a claim. *Helwig v. Vencor, Inc.*, 210 F.3d 612 (6th Cir. 2000). We granted plaintiffs' petition for a rehearing *en banc*. *Helwig v. Vencor, Inc.*, 222 F.3d 268 (6th Cir. 2000). Because this case is, at root, about sufficiency of pleading, we will examine each of plaintiffs' contentions in turn.

**1. The Impact of the Balanced Budget Act**—On February 6, 1997, President Clinton proposed the Balanced Budget Act (the "Budget Act"), which featured several Medicare provisions that would substantially affect the health care industry. Separate bills passed the House and Senate on

### II.

While the above analysis is sufficient to demonstrate that the outcome the majority reaches today is incorrect, I feel it necessary to point out a few other troubling principles the majority establishes.

### A. Analysts' Statements

The first of these principles is the majority's implicit holding--it does not discuss the question in any detail but such a conclusion is necessary to its decision--that Vencor may be liable for statements made by analysts. Specifically, analysts' statements that management was comfortable with their projections. Our Circuit has not addressed the issue of whether a company's executives can be liable for statements of analysts, and while the majority opinion makes clear they can, it does little to explain why and how. As the majority gives no explanation, I suggest that the Second Circuit's position on the matter is persuasive.

In our original panel decision, relying on *In re Time Warner, Inc., Securities Litig.*, 9 F.3d 259, 265 (2d Cir. 1993), we held "a corporation cannot be held responsible for analysts' statements about the corporation's financial health unless the corporation takes more affirmative action than simply providing information to analysts." *Helwig v. Vencor*, 210 F.3d 612, 620-21 (6th Cir. 2000). Plaintiffs, in their briefs before this en banc panel, argue that holding oversimplified the Second Circuit's position. According to plaintiffs, the

Circuit after *Basic*.

To the extent the majority is suggesting that the Supreme Court's application of the materiality standard in *Basic* controls our analysis here and does not permit us to hold as a matter of law that soft information is immaterial, I draw the reader's attention to footnote nine of the Court's opinion which made clear the Court did "not address . . . any other kinds of contingent or speculative information, *such as earnings or forecasts*." *Basic*, 485 U.S. at 232 n.9 (emphasis added). This Circuit has continued to use the standard I rely on today well after the Supreme Court's decision in *Basic*. *See In re Sofamor Danek Group, Inc.*, 123 F.3d at 402.

Marathon Oil or its shareholders. It doesn't reflect current asset values and it doesn't permit the long-term investor the opportunity to participate in the potential values that have been developed.

. . . .

Starkman argues that the failure of any of these communications to disclose the Strong and First Boston and the five-year earnings and cash flow projections constituted an omission of material facts . . . .

*Starkman*, 772 F.2d at 236. In his opinion here, Judge Merritt begins by identifying the statements made by Vencor's executives. "During [the class period], defendants made numerous statements concerning the Balanced Budget Act and its effect on Vencor's business." Maj. Op. at 20. He then concludes that these statements were misleading because Vencor did not "complete the information already given concerning the Budget Act and earnings estimates." Maj. Op. at 32. In my opinion, the issue in *Starkman* is the same as the issue here. It is not a question of whether a company can selectively disclose material information--it cannot. Rather it is a question of whether a company that makes statements on a matter is required to disclose immaterial information. Our precedent says no. I do not understand why the majority now says yes.[1]

---

[1] Lest there be any doubt that the majority is rejecting the long-standing principle that soft information is immaterial, it says in response to my dissent that *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) "has drawn the test [of materiality] more broadly" than what the majority characterizes as my test of "numbers alone." I think the majority misunderstands the basis for--at least what was--this Circuit's test for materiality. I agree with the proposition that whether information is material depends on whether it is determined that a reasonable investor would find the information important. We make that determination in the context of projections by ascertaining whether the projections are able to be calculated with substantial certainty. If they are not, then we have held that, as a matter of law, no reasonable investor could find the information important. *See In re Sofamor Danek Group, Inc.*, 123 F.3d at 402. That was the test in this Circuit prior to *Basic* and it remained the test in this

---

June 25, 1997. This necessitated a conference report, which was filed on July 30. President Clinton signed the bill on August 5. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33 (1997).

During this half-year of legislative deliberation, the proposed act alarmed sectors of the health care industry because it changed Medicare reimbursement and reduced incentive payments for hospitals that kept actual costs below federal targets. Because Vencor derived significant revenue from Medicare, it too was concerned about several aspects of the proposed act and received regular updates from its lobbyists in Washington, D.C. Plaintiffs claim that the company undertook an analysis of the proposed act as early as April 1997. According to plaintiffs, these cost analyses culminated in July 1997 when Thomas Schumann, vice president and director of Vencor's reimbursement department, circulated an internal memorandum detailing the potential impact of the legislation.

In the meantime—from at least February 10, 1997, until October 21, 1997—defendants maintained that they were "comfortable" with projections of fourth-quarter earnings of $0.59 to $0.64 per share and yearly returns between $2.10 to $2.20 for 1997 and $2.60 to $2.65 for 1998. Such sanguine statements led market analysts to recommend Vencor's stock as a "buy." In its 1996 Form 10-K, filed March 27, 1997, the company did acknowledge the looming Budget Act:

[T]he Company cannot predict the content of any healthcare or budget reform legislation which may be proposed in Congress or in state legislatures in the future, and whether such legislation, if any, will be adopted. Accordingly, the Company is unable to assess the effect of any such legislation on its business. There can be no assurance that any such legislation will not have a material adverse impact on the Company's future growth, revenues and income.

Other more cursory warnings later appeared in Vencor's first- and second-quarter 10-Q forms, filed April 23 and July 25 respectively.

On October 22, 1997, Vencor lowered its estimates of fourth-quarter earnings due to "management's recently completed analysis of the Balanced Budget Act of 1997." The stock price dropped from $42-5/8 per share to $30 per share, a nearly thirty percent decline. Soon after, the company announced that an anticipated sale of one of its divisions would not be completed. The stock price fell further to $23 per share. Plaintiffs allege that Vencor knew about the likely adverse impact of the Budget Act before its October announcement but nonetheless made false and misleading earnings statements to boost stock prices.

**2. Defendants' Knowledge of the Effect of the Budget Act**—In late June 1997, four months before Vencor publicly revealed how the Budget Act would affect its earnings, defendants Michael Barr, executive vice president and chief operating officer of Vencor, and James Gillenwater, senior vice president, met with employees of the newly acquired Transitional Hospitals Corporation. During this presentation, Barr gave the employees notice that they would be laid off in sixty days. Barr's explanation, according to plaintiffs, was that "there were tough times coming in the industry because of the likely cutbacks in Medicare" and that they "would have been laid off anyway because the proposed Medicare regulations were going to make it difficult for Vencor to make money and stay profitable." *See* Am. Compl. ¶ 72, J.A. 130.

This was nearly a month before Vencor filed its second-quarter 10-Q, in which defendants stated they could not predict whether Medicare reform proposals would be adopted by Congress "or if adopted, what effect, if any, such proposals would have on its business." Also during this time, from July to September 1997, defendant executives sold nearly $9.5 million in stock holdings. Defendant Earl Reed, executive vice president and chief financial officer of Vencor, alone

established that an executive "assumes a duty to provide complete and non-misleading information with respect to subjects on which he undertakes to speak." Maj. Op. at 32. That characterization omits the important restriction on the disclosure requirement. If the majority had gone one line further in the *Rubin* opinion, it would have realized that duty applies only to *material information*. "Having concluded that [the defendants] were under a duty not to *misrepresent or omit material facts* in connection with the proposed investment . . . ." *Rubin*, 143 F.3d at 268 (emphasis added). The facts omitted in *Rubin* were hard facts relating to the transaction--by definition material. Hence, they were required to be disclosed. Here the information at issue is soft information--by definition immaterial--and therefore management was not required to disclose it. Our precedent and § 78u-5(c)(A)(ii) make this clear.

The principle espoused by the majority contradicts our position previous to today's ruling. For, as Judge Merritt states in *Starkman*, "we begin . . . with the basic proposition that only material facts--those substantially likely to affect the deliberations of the reasonable shareholder--must be disclosed, and then only if the nondisclosure of the particular material facts would make misleading the affirmative statements otherwise required by the federal securities laws and SEC regulations." *Starkman* 772 F.2d at 238. The majority's attempt to distinguish *Starkman* as a "case about non-disclosure," Maj. Op. at 30, from this case which it says is about selective disclosure, is not supported by the facts of *Starkman*. In beginning his opinion in *Starkman*, Judge Merritt writes,

> There are three public statements by Marathon management at issue here. First, Marathon's November 11, 1981, press release, which states, in pertinent part that:
>
> > Our Board of Directors has determined that Mobil Corporation's unsolicited tender offer is grossly inadequate. The offer is not in the best interests of

## B. Information Omitted

More importantly, I think, the information the majority claims should have been disclosed--internal analyses by management of the Act's effect--is immaterial. Our case law clearly establishes that such information need not be disclosed. In *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 402 (6th Cir. 1997), we held that a company does not have a duty to disclose soft information. "[O]ur cases firmly establish the rule that soft information . . . must be disclosed only if . . . virtually as certain as hard facts." *Id.* (quoting *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)). Hard information is "typically historical information or factual information that is objectively verifiable." *Id.* The reason for this distinction is that soft information is immaterial. *See Starkman*, 772 F.2d at 239-41.

The effect of the Act on Vencor's revenue is undeniably soft information. There is absolutely no indication that the form or the effect of the Act was objectively verifiable when Vencor made its projections, which the majority seems to admit. "On any subject falling short of reasonable certainty, then, a company could offer a patchwork of honesty and omissions." Maj. Op. at 31. But the majority finds "untenable . . . both as a matter of policy and precedent," Maj. Op. at 31, that information that is not reasonably certain--that *is, information that is by definition immaterial*--need not be disclosed. In its mind, "the protections for soft information end where speech begins." Maj. Op. at 31. Indeed, according to the majority, the argument "defies application: how can a rule of non-disclosure apply to a company's disclosure?" Maj. Op. at 31. The answer is simple: exactly as § 78u-5(c)(A)(ii) says it does. Under that section, a forward-looking statement is not actionable to the extent that it is immaterial. 15 U.S.C. § 78u-5(c)(A)(ii). If a statement is not actionable, what principled reason is there for requiring disclosure?

The majority's reliance on *Rubin* to answer this question is unfounded. According to the majority, in *Rubin* we

realized more than $3 million in stock sales in September, a sum large enough to elicit inquiries from the financial media.

**3. Vencor's Acquisition of TheraTx**—On February 10, 1997, Vencor announced a "definitive merger agreement" with TheraTx, another provider specializing in rehabilitation care and occupational health. In a press release, Vencor's chief executive officer, Bruce Lunsford, explained that the acquisition would "be accretive to earnings based on projected synergies." As part of the stock purchase, however, plaintiffs allege that Vencor also acquired $25 million in bad debt and 26 poorly performing nursing homes. Though Lunsford stated that by July 24, 1997, "we successfully integrated the operations of TheraTx," computing incompatibilities prevented full consolidation until March 1998. Plaintiffs claim that these statements were false and misleading.

**4. Vencor's Acquisition of Transitional Hospitals Corporation**—On May 7, 1997, Vencor announced another acquisition. Through a $500 million senior subordinated debt private placement, the company planned to purchase Transitional Hospitals Corporation and its 58 long-term acute care hospitals. Nearly a month later, Vencor announced that it had sold $750 million of senior notes, scheduled to mature in 2007. The senior notes required that Vencor exchange them for publicly traded notes and file a registration statement effective November 18, 1997, or face additional interest. On October 8, 1997, Vencor initiated this exchange. According to plaintiffs, the company would not have been able to complete the bond offering had investors known the truth about how the Balanced Budget Act would affect Vencor.

**5. Vencor's Proposed Sale of Behavioral Healthcare Corporation**—On September 16, 1997, Vencor announced a "definitive agreement" to sell Behavioral Healthcare Corporation to Charter Behavioral Health Systems. The press release detailing the sale explained that the "transaction, which is subject to acceptable financing, due diligence . . . and certain regulatory approvals, is expected to close during

the fourth quarter of 1997." The deal collapsed, however, sagging Vencor stock further. On November 3, 1997, Vencor explained that the sale would not be consummated due to a dispute over final payment terms. Plaintiffs claim that they were misled as to the certainty of this transaction.

## II. THE PRIVATE SECURITIES LITIGATION REFORM ACT

Plaintiffs claim that Vencor made misleading statements and omissions in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) respectively, and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission, 17 C.F.R. § 240.10b-5. Plaintiffs' case turns on the discrepancy between what defendants said and what they knew prior to their announcement of revised earnings projections. Their complaint reflects the tension between the liberal requirements of notice pleading, *see Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000) ("This fundamental tenor of the Rules is one of liberality rather than technicality, and it creates an important context within which we decide cases under the modern Federal Rules of Civil Procedure."), and concern about "strike suits" aimed at jackpot discovery and predatory settlement, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975) (noting that the discovery process in securities litigation "permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence"). In 1995, Congress attempted to resolve this tension by implementing "procedural protections to discourage frivolous litigation." H.R. Conf. Rep. No. 104-369, at 32 (1995). The resulting law, the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or the "Reform Act"), insulates defendants from abusive suits in two ways relevant to this case. *See* The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67 (codified at 15 U.S.C. § 78u-4 & -5) (1995).

impact on Vencor's revenues makes estimates more uncertain. And Vencor made investors aware of this by informing them that management's projections did not include the effect of the Act with its statement that it could not predict the effect of the Act. The majority never answers the question of whether information existed to calculate future earnings with substantial certainty. Nor does it suggest how a statement that the projection does not purport to take into account proposed legislation is false because it does not take that legislation into account.

Even if there was such information, it would not make material all the statements the majority identifies. Two of the statements--the statement of comfort and the statement regarding the Act--are not earnings estimates made by Vencor's executives. The majority does not explain why these statements are material. Nor can I, as I believe they are not. I am at a loss for how an executive's statement that he is comfortable with another's projections is material. As the Fourth Circuit observed, such statements are incapable of being proven false, and, consequently, incapable of being material. *See Longman*, 197 F.3d at 683. The term comfortable in that context is vague; a reasonable investor would not rely on it. The report plaintiffs rely on, moreover, does not say that management said it was comfortable with the report. Accordingly, it is not material. Likewise, management's statement in its second quarter 10-Q filing for 1997 that it could not predict the form or effect of the Balanced Budget Act is not material. Like earnings estimates, such statements concern predictions of future events and thus are evaluated under the same standard. It should be kept in mind that two of the four proposals that plaintiffs believed would adversely affect Vencor were not passed. The President had initiated a number of unsuccessful attempts to institute Medicare reform, moreover. All these factors added to the uncertainty of the Act's form or passage this time around. The district court was entitled to take judicial notice of these facts when deciding the issue.

extrapolations, such as opinions, motives and instructions, or general statements of optimism, which 'constitute no more than puffery and are understood by reasonable investors as such.'" *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000) (quoting *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)). "[A] CEO's expression of 'comfort' with a financial analyst's predictions of his company's future earnings [is] not . . . factual in that, as a future projection, it [is] not capable of being proved false." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citing *Malone v. Microdyne Corp.*, 26 F.3d 471, 479-80 (4th Cir. 1994)). "[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to attach liability. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000); *see also Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir. 1991). Like these circuits, we have held that "sales figures, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." *James v. Gerber Prod. Co.*, 587 F.2d 324, 327 (6th Cir. 1978).

That management's statements have to be material to be actionable is only tangentially addressed by the majority. According to the majority, it does not believe that "Vencor's strong estimates of stronger earnings were so uncertain or casually disregarded by the marketplace" as to make the projections immaterial. Maj. Op. at 22. Of course, the question is not whether the projections were "so uncertain," but rather, whether they were capable of being calculated with substantial certainty. I do not believe there is any indication that they were substantially certain and the majority points to no information to persuade me otherwise. Instead, it nimbly turns the question from whether estimates were capable of being calculated with substantial certainty to whether there was a substantial certainty that the Act, if enacted, would have any adverse effect on Vencor's business. This is disingenuous. That the Act may have an adverse effect does not mean that estimates were capable of being calculated with substantial certainty. If anything, the fact that a bill was before Congress which, if enacted, would potentially have an

## A. The Safe Harbor

First, Congress created a "safe harbor" for "forward-looking statements." 15 U.S.C. § 78u-5(c)(1). Based on the judicial "bespeaks caution" doctrine, this provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance. 15 U.S.C. § 78u-5(i)(1). A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as "forward-looking"or lacked meaningful cautionary statements. 15 U.S.C. § 78u-5(c)(1).[1]

## B. The Pleading Standard

Second, Congress heightened the pleading standard for securities fraud. Before 1995, a plaintiff had to allege fraud "with particularity." Fed. R. Civ. P. 9(b). Under the PSLRA, a plaintiff must now "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In passing the Reform Act, Congress never defined "state of mind." *Hoffman v. Comshare*, 183 F.3d 542, 549 (6th Cir. 1999). It is clear that some form of fraudulent intent is required. The Supreme Court has held that scienter, "a mental state embracing intent to deceive, manipulate, or defraud," is an essential element of a §10(b) / Rule 10b-5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Though the Court has never defined the mental state required for securities fraud—and in fact expressly reserved the question, *see id.*—we have long premised liability on at least "reckless" behavior. *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir 1979). When we first interpreted how the PSLRA modified securities litigation, we explained that Congress "did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but

---

[1]For the language of this provision in the Reform Act, *see* note 2 *infra*.

instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss." *Comshare*, 183 F.3d at 548-49. In this case, then, we confront not what constitutes scienter but rather what produces a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Congress deliberately left this question unanswered. Though the Reform Act drew heavily on Second Circuit case law in fashioning the "strong inference" standard, Congress stated it did not intend to codify how that standard should be met. *See* H.R. Conf. Rep. No. 104-369, at 41 (1995). Prior to passage of the PSLRA, the Second Circuit required the securities fraud plaintiff to plead facts giving rise to a "strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). This could be met by showing that defendants either acted recklessly or had the motive and opportunity to commit fraud. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). According to the Second Circuit, the motive prong was satisfied when it was alleged that defendants "benefitted in some concrete and personal way from the purported fraud. This requirement was generally met when corporate insiders were alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir.), *cert. denied*, 121 S.Ct. 567 (2000). The opportunity prong concerned "the means and likely prospect of achieving concrete benefits by the means alleged." *Id*. at 307 (quoting *Shields*, 25 F.3d at 1130).

In its version of the Reform Act, the Senate approved an amendment recognizing motive and opportunity as a basis for liability. Senator Specter proposed this provision "so that people would know what they are to do on the pleading." 141 Cong. Rec. S9171 (daily ed. June 27, 1995) (statement of Sen. Specter). The Conference Committee dropped the Specter amendment, however, leaving the pleading requirement undefined. *See* H.R. Conf. Rep. No. 104-369, at 41 n.23

believe that the majority's reading of our case law is not supported by the opinions they rely on, but instead, it establishes a new principle which contradicts prior cases in this Circuit.

I do not believe the statements the majority identifies as misleading are material nor do I believe the information Vencor omitted is material under established securities law. In reviewing Vencor's motion, we are entitled to take into account documents referred to in the pleadings, something the majority did not do. *See* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.30[4] (3d ed. 1998).

The majority identifies three statements Vencor made that it believes Vencor knew were false or misleading. One, in Vencor's financial filings, specifically its 1997 second quarter 10-Q filing, for the period of April 1, 1997 to June 30, 1997, it stated it could not predict whether the Balanced Budget Act would be enacted and what effect such proposals, if enacted, would have. Two, the complaint alleges that Vencor spoke with analysts and projected fourth quarter earnings for 1997 and earnings for all of 1998. And three, according to the complaint, Vencor's management informed analysts in September of 1997 that it was "comfortable" with the earnings projections made by analysts prior to the enactment of the Budget Act. *See* Maj. Op. at 20. It bears emphasis that the analysts' report included in the joint appendix does not say management said it was comfortable with the projections; rather it says "management comfortable," J.A. at 856, with the estimates, which could very well be the analysts' understandings of management's statements. Nevertheless, these were all misleading, according to the majority, because management failed to disclose predictions about the impact of the Balanced Budget Act on Vencor's revenue.

### A. Statements Made

As the majority points out, if a statement is immaterial, it is not actionable. *See* 15 U.S.C. § 78u-5 (c)(1)(A)(ii); *see also* 17 C.F.R. § 240.10b-5(b). "Material representations must be contrasted with statements of subjective analysis or

---

### DISSENT

---

KENNEDY, Circuit Judge, dissenting. According to the majority, plaintiffs have alleged sufficient facts that Vencor knowingly made false or misleading statements to overcome the Private Securities Litigation Reform Act's heightened pleading standards. Because the majority fails to identify any *material* statements that defendants knew were false or misleading and adopts an excessively expansive view of the phrase "strong inference," I must respectfully dissent.

It is not entirely clear to me what the majority has held. At some points, it appears it is holding that management's statements that it could not predict the effect of the Balanced Budget Act were false. At others, it appears the majority concludes that management's projections were misleading because they did not include additional information about the effect the Act might have on Vencor's revenue. Whether the majority's holding includes one or both of these conclusions, I think it incorrect.

### I. Materiality

According to the majority, this is not a case about failure to disclose. Rather, it asserts, this is a case about selective disclosure. Under this Circuit's precedent, it concludes, once a corporation begins to speak, the corporation must disclose information such as the effect of yet to be enacted legislation on its revenue. Specifically, the majority points to *Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir. 1998) (en banc), as establishing that "a party who discloses *material facts* in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'" (emphasis added). Maj. Op. at 31. Therefore, it concludes, Vencor was required to disclose any internal reports relating to the potential effect of the Balanced Budget Act. To begin, I do not believe the majority has provided a persuasive argument under its reading of our cases. But more importantly, I

(1995). On December 19, 1995, President Clinton vetoed the bill, explaining that he had approved of the Specter amendment and that he disagreed with the intent of the Conference Committee in "erect[ing] a higher barrier to bringing suit than any now existing—one so high that even the most aggrieved investors with the most painful losses may get tossed out of court before they have a chance to prove their case." 141 Cong. Rec. S19035 (daily ed. Dec. 21, 1995) (veto message of President Clinton). Congress then overrode the veto, suggesting that it reaffirmed what the President had found objectionable.

The debate over pleading did not end with passage of the Act, however. Three years later, Congress revisited the issue of pleading requirements while debating the Securities Litigation Uniform Standards Act of 1998. Though the 1998 law concerned dual federal-state regulation of the securities market, Congress took the opportunity to underscore its intent in passing the Reform Act. In designating federal court as the exclusive venue for most securities class actions, the Senate Committee on Banking, Housing, and Urban Affairs also noted: "It was the intent of Congress, as was expressly stated during the legislative debate on the PSLRA, and particularly during the debate on overriding the President's veto, that the PSLRA establish a uniform federal standard on pleading requirements by adopting the pleading standard applied by the Second Circuit Court of Appeals." S. Rep. No. 105-182, at 6 (1998). However, the aftermath of the PSLRA has been anything but uniform as courts attempt to divine *how much* of the Second Circuit standard Congress intended to incorporate. The muddled legislative history has produced conflicting interpretations of the Reform Act. *See, e.g.*, *Comshare*, 183 F.3d at 552 n.10 ("Viewed in its entirety, the legislative history is ambiguous and does little to accurately reveal Congress' intent here."); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 533 (3d Cir. 1999) ("Ultimately, we believe there is little to gain in attempting to reconcile the conflicting expressions of legislative intent, including the President's veto statement. The legislative history on this point is

contradictory and inconclusive, and we are reluctant to accord it much weight.")

The Ninth Circuit has read the PSLRA to affect the substance of securities fraud litigation, raising the scienter element to require "strong evidence of deliberately reckless or conscious misconduct." *Janas v. McCracken (In re Silicon Graphics Sec. Litig.)*, 183 F.3d 970, 974 (9th Cir. 1999). It cites as support the Conference Committee's rejection of the Specter amendment relating to motive and opportunity and the subsequent override of the President's veto. *Id*. at 978. "The Second Circuit case law setting forth its two-prong test existed at the time the PSLRA was passed. Clearly, Congress sought to raise the standard above all existing requirements. Congress could have adopted outright the Second Circuit standard. It did not do so. It follows that Congress sought to raise the standard above that in the Second Circuit." *Id*.

The Second and Third Circuits, in contrast, have concluded that Congress intended to make only a procedural change in passing the PSLRA. *See, e.g.*, *Novak*, 216 F.3d at 310; *In re Advanta*, 180 F.3d at 534. By this view, Congress raised the pleading standard to that of the Second Circuit but no higher. Accordingly, in the Third Circuit, "it remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *Advanta*, 180 F.3d 534-35 (internal citation and quotation omitted). *Accord Press v. Chem. Inv. Services, Corp.*, 166 F.3d 529, 538 (2d Cir. 1999).

The Eleventh Circuit has taken the middle road between these positions. While it held that the PSLRA did not alter its scienter requirement of "severe recklessness," it noted that a showing of motive and opportunity alone could not sustain a complaint for fraud. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999). In arriving at this conclusion, the Eleventh Circuit explained that it was in "basic agreement" with the position of the Sixth Circuit in *Comshare*. *Id*. at 1283. Because this reading of *Comshare* is

Harold S. Bloomenthal, SECURITIES LAW HANDBOOK, 2-375 (2001 ed.). Congress has instead instructed us to dismiss complaints for securities fraud unless plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). With regard to defendants' earnings projections and disclaimers of knowledge about the Balanced Budget Act, plaintiffs have done so here. We would note that the district court, before granting summary judgment in error, arrived at the same conclusion concerning the sufficiency of the pleadings. Accordingly, we REVERSE the dismissal for failure to state a claim of securities fraud, except with respect to the claims referred to in section IV above, and REMAND the case for further discovery and proceedings on plaintiffs' claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

### C. Vencor's Proposed Sale of Behavioral Healthcare Corporation

On September 16, 1997, Vencor announced the sale of its subsidiary, Behavioral Healthcare Corporation. In early November, however, the transaction fell through due to a dispute over payment terms. Plaintiffs allege that Vencor's announcement of a "definitive" deal was misleading, intended to reassure investors of the company's solvency following its acquisition of Transitional. We find this allegation of fraud unconvincing. The press release detailing the sale explained that the "transaction, which is subject to acceptable financing, due diligence . . . and certain regulatory approvals, is expected to close during the fourth quarter of 1997." Clearly, this language suggested that the sale was conditional and any agreement was tentative. Vencor's announcement was not false and is therefore not actionable.

### V. CONCLUSION

As evidenced by the ambiguous legislative history and the split among the federal circuits, the import and application of the Private Securities Litigation Reform Act is an evolving issue. Perhaps the question would have been simpler had Congress drafted statutory language to reflect its apparent intention, such as the translation offered by one commentator:

> There are too many frivolous securities fraud class actions being filed. Such actions impose heavy costs on defendants as a result of the extensive discovery that is likely to ensue and often result in the defendants being forced to settle. There is no liability under Rule 10b-5 unless the defendant knew or recklessly disregarded that the representations were false or misleading. A court should not allow discovery unless it determines the best it can from the pleadings whether the case is likely to have merit (defendant(s) made false representations and knew they were false) if discovery is allowed or whether it appears frivolous. Judges keeping all of this in mind should exercise their discretion in determining whether the case should be allowed to proceed or be dismissed.

unduly rigid—and it is one likewise advanced by defendants—we now explicate our approach to pleading in securities fraud litigation.

In this Circuit, a defendant in an action for securities fraud may be liable for recklessness, that is, "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach*, 598 F.2d at 1025. As we explained in *Comshare*, the Reform Act did not change this scienter requirement. *Comshare*, 183 F.3d at 550. We found that Congress had instead strengthened the minimum showing necessary to survive a motion to dismiss. In this, *Comshare* disagreed with the approach of the Third Circuit, rejecting the idea that pleading motive and opportunity alone could provide a basis for liability: "We hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud." *Id*. at 551. However, the breadth of that language is qualified by the immediately preceding sentence: "While facts regarding motive and opportunity may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred*, and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct*, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter." *Id*. (emphasis added).

The proper reading of *Comshare* is less categorical and more fact-sensitive than that urged by defendants. While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind. *Comshare* made this distinction by refusing to equate motive and opportunity with scienter but yet recognizing that facts showing each may support a strong inference of recklessness. We reaffirm that plaintiffs cannot simply plead "motive and opportunity" as a mantra for recovery under the Reform Act. The Act requires plaintiffs to "specify each statement alleged

to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In this wash of allegations, "motive" and "opportunity" are simply recurring patterns of evidence. We decide cases on facts, not labels. *See Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001) ("[T]he Rules require that we not rely solely on labels in a complaint, but that we probe deeper and examine the substance of the complaint. Indeed, this court has made clear that 'the label which a plaintiff applies to a pleading does not determine the nature of the cause of action which he states.'") (quoting *United States v. Louisville & Nashville R.R. Co.*, 221 F.2d 698, 701 (6th Cir. 1955)). Whether the facts can be said to establish motive, opportunity, or neither, we are directed only to consider whether they produce a strong inference that the defendant acted at least recklessly. This necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept. *Mansbach*, 598 F.2d at 1025. Accordingly, facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice. *Comshare*, 183 F.3d at 551.

The First Circuit has adopted a fact-specific approach to the PSLRA, holding that "whatever the characteristic patterns of the facts alleged, those facts must now present a strong inference of scienter." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999). As it explained:

From the words of the Act, certain conclusions can be drawn. First, Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence. Second, the words of the Act neither mandate nor prohibit the use of any particular method to establish an inference of scienter. Third, Congress has effectively mandated a special standard for measuring whether allegations of

the successful integration of the companies. The allegations do not reveal Lunsford's statement to be false or misleading.

Plaintiffs have not stated a claim for securities fraud in connection with Vencor's acquisition of TheraTx.

### B. Vencor's Acquisition of Transitional Hospitals Corporation

On May 7, 1997, Vencor announced plans to purchase Transitional Hospitals Corporation. To finance the acquisition, defendants sold $750 million of senior notes, which they exchanged in October for publicly traded notes. According to plaintiffs, the company would not have been able to complete the bond offering had investors known the truth about how the Balanced Budget Act—enacted two months earlier—would affect Vencor.

This claim appears to be an off-shoot of plaintiffs' charge that Vencor profited from failing to speak fully about the adverse impact of the Budget Act. We have already concluded that there is a strong inference that defendants knew more than they disclosed about the financial consequences of health care reform. In their allegations concerning stock prices, plaintiffs have shown that defendants had no reasonable basis for making earnings projections without discussing the potential effect of the Budget Act. Unlike the allegations concerning the earnings estimates, though, the complaint does not support its claim for fraud in the Transitional acquisition. As was the case in *Comshare*, plaintiffs here allege only motive and opportunity to mislead without the factual basis for either. *Comshare*, 183 F.3d at 553. Vencor made no statements concerning the acquisition of Transitional that can be regarded as misleading or false.

analysis. We think a fact-finder might regard this as more than an oddly detailed, prescient expression of sympathy. As for allegations of insider stock sales, the dissent finds that "plaintiffs have made no allegation that the amount sold by defendants was not in line with prior practices." Dissent at 11. We would note that the amended complaint clearly alleges otherwise, with accompanying charts. *See* Am. Compl. ¶ 12, J.A. 98. The point is not that one account of events is right and one is wrong—that determination awaits further findings. The point is that plaintiffs are entitled to prove their case, having at least produced a strong inference of securities fraud. Fact-splitting is hardly persuasive or appropriate considering the Rule 12(b)(6) posture of this case.

## IV.  OTHER CLAIMS

### A.  Vencor's Acquisition of TheraTx

When Vencor announced plans to merge with TheraTx, another provider specializing in rehabilitation care and occupational health, Vencor's chief executive officer, Bruce Lunsford, explained that the acquisition would "be accretive to earnings based on projected synergies." Plaintiffs maintain that this statement was false because Vencor also would be acquiring $25 million in bad debt and 26 poorly performing nursing homes from TheraTx. As a forward-looking statement, Lunsford's prediction falls within the safe harbor provisions of the PSLRA. Plaintiffs must plead facts giving rise to a strong inference that Vencor had actual knowledge of the false or misleading nature of the statement. 15 U.S.C. § 78u-5(c)(1)(B). The complaint is too conclusory in this regard to satisfy that standard. Naturally, Vencor's management would expect and publicly anticipate favorable results from its merger. We doubt that defendants would have completed the merger knowing that the deal would not "be accretive to earnings."

Plaintiffs also point to Lunsford's statement that "we successfully integrated the operations of TheraTx" as false because computing incompatibilities yet remained. However, plaintiffs fail to explain how computer problems precluded

scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6). Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and "strong" inferences.

*Id*. at 195-96 (internal citations omitted).

We believe this approach best reflects the intent of Congress. In enacting the PSLRA, Congress was concerned with the quantum, not type, of proof. *See* H.R. Conf. Rep. No. 104-369, at 41 n.23 (1995) ("For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness."). It is true that the Reform Act never refers to motive and opportunity—not because these are insufficient indicia of fraud but because Congress sought a fact-sensitive approach to pleading. According to Senator D'Amato, who managed the Reform Act on the floor of the Senate,

[the Specter] amendment goes further [than the Senate bill], to say precisely what evidence a party may present to show a strong inference of fraudulent intent. I think this strait-jackets the court. Having said that, I could accept deferring to the courts [sic] interpretation, but I think we are going too far if we adopt the language that the court referred to because it would tie the courts [sic] hand by forcing it to ask that plaintiffs prove exactly the delineated facts; [sic] alleging facts to show the defendant had both the motive and opportunity to commit fraud and by alleging facts that constitute strong circumstantial evidence.

141 Cong. Rec. S9201 (daily ed. June 28, 1995) (statement of Sen. D'Amato). Because Congress did not endorse or prohibit a particular manner of pleading, we cannot disregard any set of facts as insufficient as a matter of law. We inquire instead whether those facts produce a strong inference of

scienter in securities fraud, which in this Circuit is recklessness for statements of present or historical fact and actual knowledge in the case of forward-looking statements. In *Comshare*, that test was not met. *Comshare*, 183 F.3d at 553. Other cases will allege different facts with possibly different results. Lest parties be adrift in a sea of allegations, we would point to fixed constellations of facts that courts have found probative of securities fraud. In *Greebel*, the First Circuit indicated several factors usually relevant to scienter. These have been enumerated as follows:

(1)   insider trading at a suspicious time or in an unusual amount;

(2)   divergence between internal reports and external statements on the same subject;

(3)   closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4)   evidence of bribery by a top company official;

(5)   existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6)   disregard of the most current factual information before making statements;

(7)   disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8)   the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9)   the self-interested motivation of defendants in the form of saving their salaries or jobs.

plaintiffs' case:   that Vencor had reliable information concerning the adverse effect of health care legislation, as proposed and later passed, before the company announcement of lower earnings in October and that its firing of employees in anticipation of the Budget Act belied its rosy projections to the public.

Finally, the dissent claims it is unsure of what we have held. We think today's ruling is fairly clear: a company may remain silent about estimates, projections, and preliminary data until the fullness of time and additional detail permit confident disclosure. If, however, the company chooses to make projections and issue estimates *despite* the uncertainty of that information, the Reform Act then controls the elective disclosure. At that point, the company "cannot duck liability by pointing to the 'soft' nature of the information it volunteered. It may, however, find refuge in the safe harbor of the Reform Act, provided that the statutory requirements are met." *Supra* p. 36. Among those requirements is the inclusion of "meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). This is entirely consistent with our requirement that an actor speak fully and truthfully when making a voluntary disclosure. *Rubin*, 143 F.3d at 268. *See also Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Statements of opinion or forward-looking statements such as projections, estimates or forecasts are considered 'statements of fact' for the purposes of the securities laws. As such, while a company is generally under no obligation to disclose its expectations for the future to the investing public, if the company chooses to volunteer such information, its disclosure must be full and fair, and courts may conclude that the company was obliged 'to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading . . . .'") (citations omitted).

Rather than confront plaintiffs' allegations that Vencor spoke partially and misleadingly, the dissent attempts to re-characterize the facts. According to the dissent, defendant Barr's alleged statement to outgoing employees of "tough times" ahead in the industry was only commiseration, not

In *Basic v. Levinson*, the Supreme Court stated the common sense principle that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240. To be sure, the faith an investor would place in a company's statement—and hence, its materiality—depends in part on whether given figures can be calculated with reasonable certainty. *Starkman*, 772 F.2d at 241; *James v. Gerber Prod.*, 587 F.2d 324, 327 (6th Cir. 1978). But the Supreme Court has drawn the test more broadly than the numbers alone, holding that materiality is evidenced by a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32 (citation omitted). The instant case involves favorable estimates issued despite imminent health care reform, whose adverse impact defendants long denied knowing. Even *Starkman*—the case the dissent relies so heavily upon—requires disclosure of any information that would qualify such uncertain estimates and projections. *Cf. Starkman*, 772 F.2d at 241 ("If a target chooses to disclose projections and appraisals which do not rise to this level of certainty, then it must also inform the shareholders as to the basis for and limitations on the projected realizable values."). The dissent's conclusory observation that defendants' statements were somehow immaterial simply overlooks what a potential investor in Vencor would have wanted to know.

The dissent insists that any data Vencor possessed concerning the Budget Act was likewise immaterial. In essence, the dissent offers a syllogism that any study of the Budget Act was tentative, that tentative information is "soft," that soft information is immaterial, and that immaterial information need not be disclosed—thus, Vencor's study need not be disclosed. But this assumes the very conclusion by positing that Vencor's knowledge of the Budget Act was somehow tentative or preliminary. The dissent states that "[t]here is absolutely no indication that the form or the effect of the Act was objectively verifiable when Vencor made its projections." Dissent at 5. Yet that is the whole thrust of

*See Greebel*, 194 F.3d at 196 (compiling cases). We find this list, while not exhaustive, at least helpful in guiding securities fraud pleading.

## III. PLAINTIFFS' ALLEGATIONS CONCERNING THE EFFECT OF THE BALANCED BUDGET ACT

In this case, the district court stated that plaintiffs had met the pleading requirements of the PSLRA. Because the case was before the court on a motion to dismiss, this conclusion should have cleared plaintiffs over the Rule 12(b)(6) hurdle. Yet the court, *sua sponte*, without notice to either party and without further discovery, converted the motion to dismiss into a motion for summary judgment and ruled for the defendants. This was a serious error. Rule 12 authorizes such a conversion but mandates that parties be given an opportunity to submit materials to support or oppose summary judgment. We have underscored this requirement of "unequivocal notice" on numerous occasions. *See, e.g., Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998); *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 493 (6th Cir. 1995); *Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir. 1984). In fact, the federal rules quantify this notice period, requiring at least 10 days between service and hearing of a summary judgment motion. Fed. R. Civ. P. 56(c). "Noncompliance with the time provision of the rule deprives the court of authority to grant summary judgment, unless the opposing party has waived this requirement, or there has been no prejudice to the opposing party by the court's failure to comply with this provision of the rule." *Kistner v. Califano*, 579 F.2d 1004, 1006 (6th Cir. 1978) (per curiam) (internal citations omitted).

The district court concluded that plaintiffs had "failed to prove" their claims, pointing out that they could not "simply rest on their pleadings." Because plaintiffs never had an opportunity to introduce support for their claims, we find the court's conversion to summary judgment a prejudicial surprise. Defendants have asked the court to overlook this procedural flaw, suggesting that no amount of notice could

cure the pleading deficiencies in the complaint. A panel of this court accepted that argument, noting that "an appellate court may affirm on any ground supported by the record." *Helwig v. Vencor*, 210 F.3d 612, 619 (6th Cir. 2000) (quoting *Warda v. Commissioner*, 15 F.3d 533, 539 n.6 (6th Cir. 1994)). The panel then affirmed dismissal on the grounds that plaintiffs did not state a claim under the PSLRA. We accept the premise of that ruling and likewise look to the allegations of the complaint, though we now reach a different conclusion.

Rather than reverse on the basis of the procedural error, we have undertaken a *de novo* review of the proceedings consistent with the proper Rule 12(b)(6) posture of the case. Accordingly, we "must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (internal citation omitted). Our willingness to draw inferences in favor of the plaintiff remains unchanged by the PSLRA. While Congress unquestionably strengthened the pleading standard for securities fraud, the Reform Act would hardly serve its purpose "to protect investors and to maintain confidence in the securities markets," *see* H.R. Conf. Rep. No. 104-369, at 31 (1995), were it to become a choke-point for meritorious claims. The danger of muzzling plaintiffs is enhanced by the stay provisions of the PSLRA, which authorize suspension of all discovery pending a motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(B).

Contrary to defendants' contention, the Reform Act did not reverse the polarity of securities pleading. As always under Rule 12(b)(6), we will indulge plaintiffs' inferences of fraud—provided, of course, those inferences leave little room for doubt as to misconduct. *See* 15 U.S.C. § 78u-4(b)(2) (requiring the plaintiff to "state with particularity facts giving rise to a strong inference of scienter"). Inferences must be reasonable and strong—but not irrefutable. "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct

the company. Plaintiffs have alleged that the company unveiled a bleak picture for certain employees while painting a rosy picture for the public. As with the other elements required for securities fraud, plaintiffs are entitled to prove these alleged statements and omissions upon remand.

The dissent has a second line of attack: simply brush aside plaintiffs' allegations as immaterial. This strategy is equally unconvincing. As the Supreme Court has noted, the issue of materiality is a mixed question of law and fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (defining materiality under the proxy rules of the Securities Exchange Act of 1934). Courts generally reserve such questions for the trier of fact. *See, e.g.*, *EP Medsystems Inc. v. Echocath, Inc.*, 235 F.3d 865, 875 (3d Cir. 2000); *Simon DeBartolo Group v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 172 (2d Cir. 1999). At this stage in the proceedings, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material *unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance*." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (emphasis added) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *see also EP Medsystems*, 235 F.3d at 875.

Accusing us of sleight-of-hand, the dissent states that we have "turn[ed] the question from whether future earnings were capable of being calculated with substantial certainty to whether there was a substantial certainty that the [Budget] Act, if enacted, would have any adverse effect on Vencor's business." Dissent at 3-4. Yet it is the dissent that clouds the issue by pursuing a secondary line of inquiry. Materiality is about marketplace effects, not just mathematics. The question is not whether the earnings were precisely calculable—rather, the question is whether those projections, when viewed against the backdrop of the Budget Act, were significant to the reasonable investor.

state a cause of action for securities fraud. Because we find plaintiffs to have produced a strong inference that defendants made projections and disavowed the impact of the Balanced Budget Act with actual knowledge that their statements were misleading, *a fortiori* plaintiffs have produced a strong inference that defendants acted recklessly in their statements and omissions concerning earnings estimates and the Budget Act. As to these allegations, then, plaintiffs have met the pleadings standards of the Reform Act. 15 U.S.C. § 78u-4(b)(1)-(2).

### C.  Response to the Dissent

The dissent is out of bounds in relying upon this Circuit's "soft information" cases. The dissent has challenged the writer of this opinion, claiming an inconsistency between what is said here and what he wrote in *Starkman v. Marathon Oil Co.*, a case decided ten years before the PSLRA was passed. Though we find the result here to be consistent with *Starkman*, we do not view that case as controlling or even especially relevant to the matter at hand. *Starkman* was an attempt by this court before the PSLRA to strike a balance between optimal disclosure of facts and permissive withholding of corporate prospects. In 1995, Congress re-calibrated that balance by passing the Reform Act. It is that Act, not *Starkman*, that we must apply now.

Applying the PSLRA, it is clear that the earnings estimates are "forward-looking statements" within the definition of 15 U.S.C. § 78u-5(i)(1). The dissent would characterize the unidentified contingencies affecting these projections—such as the company's awareness of the Budget Act—as "soft information" that need not be disclosed. Yet this "soft information" designation appears nowhere in the Reform Act. On the contrary, the PSLRA compels disclosure of such limiting assumptions by conditioning availability of the statutory safe harbor upon inclusion of "meaningful cautionary statements." Here, according to the complaint, Vencor issued strong, optimistic projections but suppressed additional data that it believed would mean "tough times" for

follows from a plaintiff's proposition of fact. Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather, the "strong inference" requirement means that plaintiffs are entitled only to the most plausible of competing inferences. *See* Black's Law Dictionary 1423 (6th ed. 1990) (defining "strong" as "cogent, powerful, forcible, forceful"). This represents a significant strengthening of the pre-PSLRA standard under Rule 12(b)(6), which gave the plaintiff "the benefit of *all* reasonable inferences," *Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir. 1994) (emphasis added), and contemplated dismissal "only if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations." *Bloch*, 156 F.3d at 677 (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

With the aid of additional briefing and oral argument, the court has examined plaintiffs' allegations in light of the pleading standards for private securities litigation. Whether certain of these statements, which are clearly "forward-looking" within the meaning of the Reform Act, enjoy safe harbor immunity is a close question. In fact, as an exemption from liability, this provision would seem to produce a factually complex question more appropriate for summary judgment. This is especially so considering that the plaintiff must "prove that the forward-looking statement . . . was made with actual knowledge" to prevail, a formidable burden at the pleading stage. 15 U.S.C. § 78u-5(c)(1)(B). Nevertheless, Congress apparently intended the applicability of the safe harbor to be addressed even on a motion to dismiss. *See* 15 U.S.C. § 78u-5(e) (instructing courts to consider "any cautionary statement accompanying the forward-looking statement" upon a motion to dismiss based on the safe harbor provisions).

Accordingly, we must decide whether defendants can claim safe harbor protection for their forward-looking statements. For those statements that are not forward-looking or do not fit within the statutory shelter, we must determine whether

plaintiffs have stated a claim under the PSLRA. As we apply the pleading standards of the Reform Act, we keep in mind the substantive elements of a claim for securities fraud. To prevail on a § 10(b)(5) / Rule 10b-5 claim, a plaintiff must establish (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury. *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991). We conclude that the pleadings permit a strong inference that defendants engaged in securities fraud concerning their statements about the Balanced Budget Act and its adverse impact on Vencor's business. Because we also find that these statements cannot fit within the statutory safe harbor, we REVERSE in part the judgment of the district court and REMAND for further proceedings.

## A.  Vencor's Forward-Looking Statements

Plaintiffs have alleged a class period of February 10, 1997, until October 21, 1997. During this time, defendants made numerous statements concerning the Balanced Budget Act and its effect on Vencor's business. In its quarterly and annual reports filed with the Securities and Exchange Commission, Vencor stated that it could not gauge the impact of the legislation as it progressed through Congress. At the same time, the company projected fourth-quarter earnings of $0.59 to $0.64 per share and yearly returns between $2.10 to $2.20 for 1997 and $2.60 to $2.65 for 1998. According to plaintiffs, Vencor told analysts that it was "comfortable" with these figures as late as September 25, 1997, nearly seven weeks after the Balanced Budget Act was signed into law. These statements were "forward-looking" within the meaning of the PSLRA in that they reflected predictions about earnings, revenue, and future economic performance. *See* 15 U.S.C. § 78u-5(i)(1). Plaintiffs urge that Vencor's professed inability to assess the impact of the Budget Act was a statement of then-present fact. Even as a statement of existing condition, however, these statements were forward-looking in that they concerned "assumptions underlying or relating to" economic predictions. 15 U.S.C. § 78-5(i)(1)(D).

choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

Vencor points to policy reasons against disclosure of information that has not achieved reasonable certainty. *See, e.g.*, *Searls v. Glasser*, 64 F.3d 1061, 1067 (7th Cir. 1995) ("Before management releases estimates to the public, it must ensure that the information is reasonably certain. If it discloses the information before it is convinced of its certainty, management faces the prospect of liability.") (internal citations omitted). This point is well-taken. It would seem that extending *Rubin* to situations involving contingent events such as predicting the effect of legislation on a business may subject corporations to liability or deter them from alerting investors. However, a company should not be allowed to bolster its stock price by predicting rosy earnings while knowing, as plaintiffs allege here, that legislation is nearing its finals stages that could capsize those projections. As we have recognized previously, "Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded." *Mayer*, 988 F.2d at 639.

Thus, it appears that the need for information in the name of completeness can conflict with the need to incubate uncertain data and avoid liability. These competing interests are reconciled in the Reform Act. If a company chooses to speak on an uncertain subject—as here, when Vencor claimed an inability to assess the Budget Act while simultaneously issuing flush earnings estimates—it cannot duck liability by pointing to the "soft" nature of the information it volunteered. It may, however, find refuge in the safe harbor of the Reform Act, provided that the statutory requirements are met. Here, we find they were not.

## B.  Sufficiency of Plaintiffs' Complaint

Having concluded that defendants' statements concerning the Balanced Budget Act are outside the statutory safe harbor, we now ask whether plaintiffs have alleged sufficient facts to

financial condition of his client, he assumes a duty to provide complete and non-misleading information with respect to subjects on which he undertakes to speak.

*Id.*

Contrary to the way in which the district court and panel majority framed the issue, the question in this case is not whether Vencor had a duty to divulge its internal assessments of the Balanced Budget Act. Rather, the question is whether the company had a duty to complete the information already given concerning the Budget Act and earnings estimates. Though the Reform Act does not impose a "duty to update," see 15 U.S.C. § 78u-5(d), and we do not decide today whether such an obligation exists,[6] we at least require an actor to "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." *Rubin*, 143 F.3d at 268. The characterization of opinions and projections as "soft" is beside the point in this case. Again, the question here is not the duty to speak but liability for not having spoken enough. In *Rubin*, we quoted the pithy observation of the Seventh Circuit that "under Rule 10b-5 . . . the lack of an independent duty does not excuse a material lie." *Id.* (quoting *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991)). With regard to future events, uncertain figures, and other so-called soft information, a company may

---

[6] The duty to update "concerns statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *In re Burlington Coat Factories Sec. Litig.*, 114 F.3d 1410, 1431 (3d Cir. 1997). As the Third Circuit pointed out, "For a plaintiff to allege that a duty to update a forward-looking statement arose on account of an earlier-made projection, the argument has to be made that the projection contained an implicit factual representation that remained 'alive' in the minds of investors as a continuing representation." *Id.* at 1432. However, we regard certain of defendants' statements—such as the claimed inability to foresee the legislation in late July and the "comfort" statements in September—as misleading not only in light of later events but also at the time they were made. We therefore need not reach the question of whether we recognize a duty to update.

---

Therefore, all of defendants' earnings projections and statements about the Balanced Budget Act qualify as "forward-looking." As such, defendants are liable only if the statements were material; if defendants had actual knowledge that the statements were false or misleading; and if the statements were not identified as "forward-looking" or lacked meaningful cautionary language. *See* 15 U.S.C. § 78u-5(c)(1).[2]

**1. Materiality**—Defendants would dismiss their optimistic projections and internal estimates as "soft, puffing statements" that are immaterial as a matter of law. There is support for the proposition that "sales figures, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." *James v. Gerber Prod.*

---

[2] This formulation is drawn from the statutory text, which is written in the negative disjunctive:

Except as provided in subsection (b), in any private action arising under this title . . . that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) *shall not be liable* with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A)    the forward-looking statement is—

(i)    identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; *or*

(ii)   immaterial; *or*

(B)    the plaintiff fails to prove that the forward-looking statement—

(i)    if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii)   if made by a business entity;[sic] was—

(I)    made by or with the approval of an executive officer of that entity; and

(II)   made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1) (emphasis added).

*Co.*, 587 F.2d 324, 327 (6th Cir. 1978).  Yet we do not agree that Vencor's estimates of strong earnings were so uncertain or casually disregarded by the marketplace.  In the context of the Budget Act—whose form and effect the company denied knowing until seven weeks after its passage—the projections were framed as material reassurances of continued good fortune.  As one securities commentator puts the point:

> Arguably, matters that are not material because they are not so probable or relevant as to be required to be disclosed in a particular context may be material if information about them is stated falsely or misleadingly in communications that are not otherwise required to be made.  If, by assumption, there is no need to make the statement, a volunteered false statement about the future is more likely to be uttered to serve the speaker's purpose, and pro tanto may be misleading, than a failure to make any statement about the future.

Victor Brudney, *A Note on Materiality and Soft Information Under the Federal Securities Laws*, 75 VA. L. REV. 723, 750 (1989).

The Supreme Court has endorsed a fact-intensive test of materiality in securities fraud cases.  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  Specifically, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information."  *Id*.  *Basic* involved a company's denials of preliminary merger negotiations, which were in fact on-going.  A panel of our court reversed summary judgment for the defendant company, holding that "once a statement is made denying the existence of any discussions, even discussions that might not have been made material in absence of the denial are material because they make the statement made untrue."  *Levinson v. Basic Inc.*, 786 F.2d 741, 749 (6th Cir. 1986).  On appeal, the Supreme Court

Under *Starkman* and *Sofamor Danek*, it is true that defendants had no independent duty to divulge their internal appraisals of the Budget Act, a comprehensive study that plaintiffs allege began in April and was completed by July.  Nor do we disagree that the non-disclosure cases survive the Reform Act.  But the protections for soft information end where speech begins.  Though forward-looking statements may *contain* soft information, they do not themselves *constitute* soft information; thus, public revelation cannot partake of the shelter under *Starkman*.  In fact, the argument defies application: how can a rule of non-disclosure apply to a company's disclosure?  If—as defendants contend—the protection for soft information remains intact even after a company speaks on an emerging issue, the speaker could choose which contingencies to expose and which to conceal.  On any subject falling short of reasonable certainty, then, a company could offer a patchwork of honesty and omission.  This proposition is untenable, however, both as a matter of policy and precedent.

On the facts of *Starkman*, a corporation that chooses to divulge uncertain estimates "must also inform the shareholders as to the basis for and limitations on the projected realizable values."  *Starkman*, 772 F.2d at 241.  In *Rubin v. Schottenstein*, we elaborated on the idea that, even absent a duty to speak, a party who discloses material facts in connection with securities transactions "assume[s] a duty to speak fully and truthfully on those subjects."  *Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir. 1998) (en banc).  There, a lawyer touted his client's securities to prospective investors, failing to mention the company's banking default.  When the company filed for bankruptcy, the investors sued it as well as the lawyer for securities fraud.  Sitting en banc, we disagreed with the panel majority opinion that had found no duty of disclosure under Rule 10b-5.  Concluding that the lawyer was under a duty not to omit material facts, we noted:

> In sum, while an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the

defendant's practices was available to analysts and that the company had stated publicly its "premium prices" for hospital loaner kits. According to the court, the significance of this already public information—the warning letter and the loaner kit charges—was a "matter of opinion" and did not require further explanation by the company. *Id*.

*Starkman* also featured allegations of securities fraud. There, a shareholder of Marathon Oil sued the company for not disclosing merger negotiations with U.S. Steel. According to the complaint, the defendant did not divulge asset appraisals and earnings projections prepared in connection with a friendly tender offer. These figures, according to the plaintiff, would have informed his decision whether to sell his shares or await a higher price. A panel of this court affirmed summary judgment for the defendant, concluding that "a tender offer target must disclose projections and asset appraisals based upon predictions regarding future economic and corporate events only if the predictions underlying the appraisal or projection are substantially certain to hold." *Starkman*, 772 F.2d at 241.

Defendants maintain that their statements concerning the Balanced Budget Act are not actionable because they qualify as "soft information" under the non-disclosure rules of *Starkman* and *Sofamor Danek*. This conclusion is mistaken because these cases are inapposite. In *Sofamor Danek*, the information claimed as adverse to the company had already been disclosed and was publicly available to permit an independent assessment by investors and analysts. And *Starkman* was a case about non-disclosure. This case, in contrast, is about selective disclosure of information known exclusively to defendants and essential to complete a picture they had only partially revealed. While it is true that "silence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), Vencor here did not maintain its silence. Defendants' segue from non-disclosure to non-actionability overlooks the fact that they had already volunteered much "soft" information.

rejected this standard of materiality,[3] explaining that "in order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic*, 485 U.S. at 238. Though *Basic* did not address earnings forecasts or projections, *see id*. at 232 n.9, we find its articulation of the basic policies underlying securities regulation applicable here as well: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." *Id*. at 230 (quoting H. R. Rep. No. 1383, at 11 (1934)). The Court added that it "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Id*. (citation and internal quotations omitted).

In this case, it cannot be said that Vencor's preliminary appraisals and internal assessments of the Balanced Budget Act were material solely by virtue of their omission. As discussed *infra*, plaintiffs have alleged facts to produce a strong inference that defendants knew that the Budget Act could adversely affect their operations. Yet defendants simply rested on their disavowals of knowledge while continuing to make favorable earnings predictions. We conclude that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. at 231-32 (citation omitted). Thus, this information cannot be deemed "immaterial" within the meaning of the PSLRA. 15 U.S.C. § 78u-5(c)(1)(A)(ii).

---

[3] *Basic* concerned the proper standard of materiality. We do not understand the Supreme Court to have disturbed the premise for liability in that case, *viz*., "corporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decisionmaking." *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) (citing *Basic*, 485 U.S. at 239 n.17).

**2.    Actual Knowledge of Misleading or False Nature**—Defendants claim that the Balanced Budget Act was a "moving target" until it was signed, subject to committee compromise and negotiation, and that its complexity and impact were impossible to assess until long after it was enacted. As Vencor maintains, "Defendants did come to a reasonably certain conclusion that the impact of the [Balanced Budget Act] would be negative. But there are no facts suggesting that this occurred even a day earlier than October 22, 1997." The thrust of defendants' argument is not that they were surprised or caught unprepared for the Budget Act on October 22, 1997, the day Vencor announced lower earnings and triggered a nearly thirty percent decline in its stock. Rather, Vencor asserts that any assessment of the act before that time was tentative and did not require disclosure.

Vencor's claimed inability to assess the adverse impact of the Budget Act is plausible—but only to a point. As the legislation progressed through Congress, this protestation of ignorance became increasingly hollow. In their second-quarter 10-Q filing, defendants reiterated that "[m]anagement cannot predict whether such proposals will be adopted or if adopted, what effect, if any, such proposals would have on its business." This was filed July 25, 1997, one month after budget bills had passed both the House of Representatives and the Senate, fifteen days after a committee conference was held, and six days before the final bill was cleared for the President's signature. On or about September 25, plaintiffs allege that Earl Reed, executive vice president and chief financial officer of Vencor, and Bruce Lunsford, executive vice president and chief executive officer, informed analysts that Vencor was still "comfortable" with favorable earnings per share figures made before the Budget Act, which was by then seven weeks old.[4] Yet by August 5, if not before, the

---

[4] The panel majority found that "the pleadings set forth no statements, after August 5, 1997, which are directly attributable to any of the defendants." The dissent likewise challenges our decision today as predicating liability on analysts' statements alone. We hold no such thing. Plaintiffs' allegation of the statement made by defendants on

*Charal v. Royal Appliance Mfg. Co.*, No. 94-3284, 1995 U.S. App. LEXIS 24626, at *8 (6th Cir. Aug. 15, 1995) (unpublished disposition) (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)). Vencor's blanket statements concerning pending legislation offered investors no guidance about the consequences of health care reform upon the company's business. These statements were not meaningful and were hardly even cautionary. Accordingly, they are not sheltered by the safe harbor provided by the PSLRA.

Defendants rely on a line of cases preceding the PSLRA that holds that a company need not disclose "soft information" to the investing public. This type of information is defined only by its uncertainty: predictions, matters of opinion, and asset appraisals have all been regarded in this Circuit as "soft." *See Murphy v. Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 (6th Cir. 1997); *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985). "Hard information," in contrast, "is typically historical or other factual information that is objectively verifiable." *Sofamor Danek*, 123 F.3d at 401 (quoting *Garcia v. Cordova*, 930 F.2d 826, 830 (10th Cir. 1991)). In *Sofamor Danek*, this court recognized that "our cases firmly establish the rule that soft information . . . must be disclosed only if . . . virtually as certain as hard fact." *Id.* at 402 (quoting *Starkman*, 772 F.2d at 241).

*Sofamor Danek* involved alleged misrepresentations and omissions by a company that manufactured and marketed spinal implant devices. According to the complaint, which was dismissed prior to the enactment of the PSLRA, the defendant corporation failed to disclose that it was promoting its devices for unauthorized use and that it was making improper sales of "loaner kits" to hospitals. Plaintiffs claimed securities fraud, alleging that these omissions, along with related misstatements, artificially elevated the company's stock price. A panel of this court affirmed dismissal, explaining that this information did not give rise to a duty to disclose. The court noted that a warning letter from the United States Food and Drug Administration concerning

a company need not list all factors, the legislative history makes clear that "boilerplate warnings will not suffice . . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." H.R. Conf. Rep. No. 104-369, at 43 (1995).

The safe harbor was designed to encourage company disclosure of future plans and objectives by removing the threat of liability. H.R. Conf. Rep. No. 104-369, at 45 (1995). In crafting it, Congress drew on the judicially created "bespeaks caution" doctrine, which states that "beliefs about future statements which turn out to be incorrect are not actionable under Section 10(b) if the statements contain sufficient cautionary language." *Mayer*, 988 F.2d at 639. As the Eleventh Circuit observed, "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. IVAX Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).

According to the plaintiffs, that is not what happened here. In its 1996 10-K filing, dated March 27, 1997, Vencor described proposals for healthcare reform and specifically warned that its projections could differ from actual results due to possible legislation, cost-containment measures, problems in state licensure, and difficulties in integrating acquired entities. Yet as the Budget Act neared enactment and as the warning signs flared, Vencor's precautions grew more cursory and abstract. In its first- and second-quarter filings of 1997, the company stated only that it could not predict the form, effect, or likelihood of any proposed legislation. Substantially similar language also appeared in Vencor's 10-K filings from 1995, 1994, and 1993. In applying the bespeaks caution doctrine, we have noted that "cautionary statements must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge."

form of the legislation had become fixed and its impact measurable.

These predictions and opinions contain "at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Schneider v. Vennard (In re Apple Computer Sec. Litig.)*, 886 F.2d 1109, 1113 (9th Cir. 1989). When defendants disclaimed any ability to predict health care legislation, while persisting in favorable earnings estimates even seven weeks after enactment of the Budget Act, Vencor was representing that it knew of no way the Budget Act could adversely affect its operations.[5] However, plaintiffs point out numerous "red flags" that warned Vencor of impending problems in the industry. As early as April 1997, Thomas A. Scully, president of the Federation of American Health Systems, testified before the Senate Finance Committee on the Budget Act. In describing the effect of the legislation on his organization's members, which included Vencor, he explained, "[W]e are

---

September 25, 1997, attributes the earnings projections to Lunsford and Reed. Moreover, the complaint identifies the analysts to whom the statements were made—Maureen Sullivan of Cowen & Company and Scott Mackesy of Morgan Stanley—as well as the timing and contents of the discussion. Am. Compl. ¶ 100, J.A. 142. These details meet the particularity requirement for pleading fraud under both Fed R. Civ. P. 9(b), *see Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir. 1988), and the Reform Act, *see Novak*, 216 F.3d at 314 ("Accordingly, a complaint can meet the new pleading requirement . . . by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs."). Contrary to the dissent's insistence, plaintiffs' allegation concerning the September 25 statement does not rely solely on third-party reports as its source.

[5] As discussed *infra*, we do not find the cautionary language sufficiently meaningful to correct this misleading representation. At any rate, the Conference Report pointed out that "the applicability of the safe harbor provisions under subsection [15 U.S.C. § 78u-5](c)(1)(B) shall be based on the 'actual knowledge' of the defendant and does not depend on use of cautionary language." H.R. Conf. Rep. No. 104-369, at 47 (1995).

concerned about both the level of cuts and the direction of many of the policies included in the President's Budget." Am. Compl. ¶ 49, J.A. 122.

As previously noted in section I.2 above, plaintiffs have alleged that Executive Vice President Barr told Transitional Hospitals employees in June 1997 that they would be laid off because of the impact of the Budget Act and the "tough times coming" that "were going to make it difficult for Vencor to make money and stay profitable." Vencor now explains that Barr's reference to Medicare cutbacks was limited to Vencor's hospital operations, which defendants claim comprised only 20 percent of the company's revenues. What Barr intended by his warning is not an issue we are prepared to resolve at this stage. For now, we note only that Vencor knew of "tough times" ahead for at least some of its operations.

Also as noted above, plaintiffs state that defendants sold nearly a quarter million shares from July to September 1997, yielding proceeds of $9.5 million. Defendant Reed alone sold more than $3 million in stock in mid-September, after passage of the Budget Act but before Vencor released its revised earnings estimates. This amount was substantial enough to attract the attention of the financial media. Vencor told inquiring analysts that Reed was selling stock simply to retire a personal loan. Whether this explanation is accurate is not an issue we can decide on the pleadings. *See Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) (explaining, in reversing dismissal of a securities fraud complaint alleging deceptive corporate statements, "[w]hether the statements here were true or false is not an issue to be decided under Rule 12(b)(6)"). We observe only that third-party analysts regarded Reed's sales as disproportionate.

These allegations suggest that it was obvious that the impact of the Balanced Budget Act would be adverse to Vencor before October 22, 1997. A health care executive whose organization represented Vencor testified before Congress about his concerns in April. The timing of Vencor's

estimates and purported myopia concerning the Budget Act, when compared against the progress of the legislation through Congress, indicates that defendants consciously disregarded the warning signs of health care cutbacks. Certain defendant executives even acknowledged that "tough times" were ahead for at least part of the company and sold millions of dollars in stock after the act was signed but before prices plummeted. We have previously compared the common law requirements for fraud to a showing of scienter under federal securities laws. *Mansbach*, 598 F.2d at 1024. Though the comparison is not exact, it is instructive as to the allegations in this case.

> A defendant who asserts a fact as of his own knowledge or so positively as to imply that he has knowledge, under the circumstances when he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have intent to deceive, not so much as to the fact itself, but rather as to the extent of his information.

PROSSER AND KEATON ON TORTS 741-42 (5th ed. 1984) (citations omitted). On the basis of these allegations, we conclude that plaintiffs have produced a strong inference that defendants persisted in making favorable predictions and feigning ignorance of the Budget Act with actual knowledge that their statements were misleading.

**3. Not Identified as Forward-Looking / Absence of Meaningful Cautionary Statements**—Though defendants described their predictions as "forward-looking" in the 1996 10-K, other SEC filings and press releases during the class period lacked this designation. Moreover, the first- and second-quarter 10-Q filings contained only a generic disclaimer of knowledge about "whether such proposals will be adopted or if adopted, what effect, if any, such proposals would have on its business." The safe harbor provision, in contrast, requires that defendants identify "important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u-5(c)(A)(i). While the Conference Committee explained that