Michael **CAMPBELL**, et al., Plaintiffs,

v.

**LEXMARK INTERNATIONAL INC. et al., Defendants.**

**In re Lexmark International Securities Litigation**

No. CIV.A. 01–485–JMH.

United States District Court,
E.D. Kentucky,
Lexington.

Nov. 8, 2002.

Charles G. Middleton, III, James E. Milliman, Middleton & Reutlinger, Louisville, KY, Steven G. Schulman, Samuel H. Rudman, Milberg, Weiss, Bershad, Hynes & Learch, L.L.P., New York City, Kenneth J. Vianale, Maya Saxena, R. Timothy Vannatta, Milberg Weiss Bershad Hynes & Learch LLP, Boca Raton, FL, Nadeem Faruqi, Faruqi & Faruqi, LLP, New York City, Tara Isaacson, Milberg, Weiss, Bershad, Hynes & Learch, L.L.P., Boca Raton, FL, Mel E. Lifshitz, Jeffrey M. Harber, Bernstein, Liebhard & Lifshitz, LLP, New York City, Sandra D. Stein, Philadelphia, PA, Jack G. Fruchter, Fruchter & Twersky LLP, New York City, for Plaintiffs.

Robert M. Watt, III, Steven Brian Loy, Stoll, Keenon & Park, LLP, Lexington, KY, Robert A. Alessi, Elai KAtz, Cahill Gordon & Reindel, New York City, for Defendants.

Charles G. Middleton, III, Middleton & Reutlinger, Louisville, KY, Sandy A. Liebhard, Mel E. Lifshitz, Bernstein, Liebhard & Lifshitz, LLP, New York City, for Movant.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

Defendants have moved to dismiss [Record No. 49]. Fully briefed, defendants' motion is ripe for review.

### INTRODUCTION

This is a class-action securities litigation lawsuit in which plaintiffs, representing all persons who purchased or otherwise acquired Lexmark International, Inc. ("Lexmark" or the "Company") common stock on the open market between March 20, 2001 and October 22, 2001 (the "class period"), seek damages for defendants' alleged violations of federal securities law—specifically, the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs bring suit under section 10(b) of the Exchange Act and Rule 10b–5, promulgated thereunder, and under § 20(a) of the Exchange Act. The named defendants are the Company and individual defendants Paul J. Curlander ("Curlander"), President and Chief Executive Officer, Gary E. Morin ("Morin"), Senior Vice President and Chief Financial Officer, Marvin L. Mann ("Mann"), Director of the Company, David L. Goodnight ("Goodnight"), Corporate Vice President and Comptroller until June, 2001, then Corporate Vice President of Asia Pacific and Latin America, and Gary D. Stromquist ("Stromquist"), Vice President

and Corporate Controller beginning in July, 2002.[1]

While plaintiffs allege generally that defendants "knowingly or recklessly issued false and misleading statements in annual and quarterly filing with the Securities Exchange Commission ("SEC"), press releases and other public media concerning the Company's financial condition and results of operations," the gravamen of plaintiffs' complaint is that "[t]he Company's failure to write-down the drop in value of its unsaleable printer inventory artificially enhanced its financial condition, thereby artificially inflating its stock price." [Plaintiffs' Consolidated and Amended Class Action Complaint, ¶¶ 2,4]. Plaintiffs allege that, in failing to write-off in a timely manner certain end-of-life and "below-cost" printer inventory, defendants violated both Generally Accepted Accounting Principles ("GAAP") as well as the Company's own internal accounting policies. Plaintiffs contend that defendants attempted to "mask" the tardy inventory-related write-off as a series of subsequent, one-time "Restructuring Charges."

## STANDARD OF REVIEW

The standard of review for motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is no secret. "A district court's grant of a motion to dismiss is proper when there is no set of facts that would allow the plaintiff to recover. All factual allegations are deemed true and any ambiguities must be resolved in plaintiff's favor." *Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253, 258 (6th Cir.1994). While this standard of review is liberal, the plaintiff is required to plead more than bare assertions of legal conclusions. "In practice, a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir.1993) (quoting *Scheid v. Fanny Farmer Candy Shops*, 859 F.2d 434, 436 (6th Cir.1988)).

Though pleading standards are—as a rule—quite liberal, pleading standards are different in securities fraud cases. In such cases the standard is more rigorous, pursuant to federal legislative directive.

That legislative directive takes the form of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Act, enacted in response to growing concern over frivolous securities lawsuits and to combat perceived litigation excesses, significantly changed the landscape of federal securities litigation.[2] Among other things, the Act imposes an obligation on plaintiffs to, "with respect to each act or omission alleged to violate [the Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

But this pleading standard respecting the "required state of mind," or "scienter," [3] is subject to interpretation, and different circuits have construed the statutory provision differently.[4] *This* Court,

---

1. These positions are those of the named defendants as held during the class period.

2. "[T]he PSLRA of 1995 . . . insulates defendants from abusive suits." *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir.2001).

3. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

4. As one leading commentator put it: "[T]he Circuit Courts of Appeal have differed, sometimes significantly, in their interpretation of the requirement for pleading scienter under the PSLRA. Throughout the last several years, *nine* circuits have issued a myriad of decisions interpreting this key provision of the PSLRA." Tower C. Snow, Jr., *The Diverging Circuit Court Standards for Pleading Scienter Under the Private Securities Litigation Reform*

however, is guided by the decisions of the United States Court of Appeals for the Sixth Circuit—a circuit court that, luckily, has addressed this issue directly. *See Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir.2001) (en banc).

In *Helwig*, a thorough and treatise-like opinion reviewing exhaustively the various circuit court approaches to the PSLRA's scienter pleading requirements, the Sixth Circuit staked out its own position. The court also provided a laundry-list of factors to be considered by lower courts in considering the question whether scienter has been adequately pled—factors that the Court endeavors to apply herein and ones which, upon application, compel the Court's conclusion as stated below.

## ANALYSIS

While defendants raise several other defenses under the PSLRA,[5] the defendants most vehement—and persuasive—argument is that plaintiffs have not met the heightened pleading standards respecting scienter, standards imposed by the PSLRA. For the reasons stated below, the Court agrees with defendants that plaintiffs have not plead facts that raise a "strong inference that defendant[s] acted with the required state of mind [i.e., scienter]," as required under the PSLRA.

*Act of 1995*, 1332 PLI/Corp 261, 265–66 (2002) (emphasis added). The same commentator explained that:

> In an attempt to clarify the standard, the First, Second, Third, Sixth, Ninth, and Eleventh Circuits indirectly addressed this issue in a flurry of decisions beginning in 1999. In 2001, the Fifth, Eighth, and Tenth Circuits weighed in on this issue as well. The Second Circuit was the first appellate court to directly rule on the issue when it stated ... that the PSLRA merely codified the pre-PSLRA Second Circuit standard. Shortly thereafter, the Third Circuit issued

### I. Pleading Scienter under the PSLRA

Though the new scienter pleading standards under the PSLRA remains somewhat nebulous, this much is clear: more—*much* more—is required of plaintiff in order to survive a motion to dismiss. At the very least, the "heightened pleading requirement for scienter strengthens the pre-PSLRA standard under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which gave the plaintiff 'the benefit of all reasonable inferences.'" *In re Federal–Mogul Corp. Securities Litigation*, 166 F.Supp.2d 559, 564 (E.D.Mich.2001) (citations omitted). Indeed, it may be (and has been) said that, by virtue of the new, "strong inference" standard under the PSLRA, Congress essentially carved out a special pleading standard for securities cases. Wrote the First Circuit in *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999), and quoted with approval by the Sixth Circuit in *Helwig:*

> Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6). Rather, inferences of scienter survive a motion to dismiss

> a decision essentially endorsing the rule espoused [by the Second Circuit], whereas the First, Sixth, Eighth, Tenth, and Eleventh Circuits later endorsed a slightly ... strict[er] pleading standard.
>
> *Id.* at 266.

5. Most notably, defendants also argue that the statements alleged to be false or misleading are "forward-looking" statements and are, therefore, protected under the "safe harbor" provisions of the PSLRA. *See* 15 U.S.C. § 78u–5(c)(1).

only if they are both reasonable and "strong" inferences.

*Greebel,* 194 F.3d at 195–96. The *Helwig* Court added that, under the PSLRA's "strong inference" requirement, "plaintiffs are entitled only to the most plausible of competing inferences," *Helwig,* 251 F.3d at 553, and instructed that courts should indulge inferences of fraud only if "those inferences leave little room for doubt as to misconduct." *Id.* at 543.

It is one thing to say that the PSLRA requires more of plaintiffs by way of scienter allegations, quite another thing, however, to say how much more. The real question is "How much is enough?" It is on this point that the statute offers little guidance and, unsurprisingly, it is on this point that the circuits go their separate ways.

Luckily, however, the Sixth Circuit in *Helwig* provided guidance. Recognizing the potential elasticity of the "strong inference" standard and anticipating lower-court difficulty with respect to its application, the *Helwig* court set forth a nonexhaustive list of factors to be considered by lower courts in attempting to determine whether a plaintiff has established a "strong inference" providing "little room for doubt as to misconduct." "Lest parties be adrift in a sea of allegations," wrote the *Helwig* court, "we would point to fixed constellations of facts that courts have found probative of securities fraud." *Id.* at 553. The court then noted the following nine factors, as originally articulated by the First Circuit in *Greebel:* (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject, (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information, (4) evidence of bribery of a top company official, (5) existence of an ancillary lawsuit charging fraud by a com-

pany and the company's quick settlement of that suit, (6) disregard of the most current factual information before making statements, (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication, (8) the personal interest of certain directors in not informing disinterested directions of an impending sale of stock, and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Id.*

## II. Allegations of Scienter in the Instant Case

Whether plaintiffs have met their burden of raising a "strong inference" of scienter "leaving little room for doubt as to misconduct" requires, of course, an inspection of the specific language of plaintiffs' Consolidated and Amended Class Action Complaint (the "Complaint"). Recognizing (it would seem) the heightened requirements for pleading scienter, plaintiffs have devoted a special section in their Complaint to, as the section is titled, "Scienter Allegations." Such a format greatly assists the Court in addressing the question at hand.

Looking to the language of the complaint, the first paragraph of plaintiffs' "Scienter Allegations" is general in nature. Plaintiffs paint with a broad brush and reiterate the complaint's consistent theme that defendants issued "false and misleading statements" as part of a "fraudulent scheme" in which the individual defendants acted in "complicity" with one another. [Plaintiffs' Consolidated and Amended Class Action Complaint, ¶ 154]. There can be no doubt but that such broad, sweeping language does not itself create a "strong inference" of scienter. Such allegations are general and conclusory.

Plaintiffs, however, offer more. Specifically, plaintiffs include a table detailing the

individual defendants' specific trades (date, number of shares sold, and profits). For various reasons, plaintiffs allege that "these sales were unusual in amount." *Id.* at ¶ 156. In support of this contention, plaintiffs note that individual defendant Mann sold no Lexmark shares in the year prior to the class period and had only one sale in the previous five years; by contrast, during the class period Mann made six sales in only six months for proceeds approximating $26 million. Plaintiffs also note that, whereas defendant Curlander made no sales in the five years prior to the class period, he sold approximately 38,000 shares in the class period for a profit of nearly $2 million. Finally, plaintiff note that, whereas defendant Morin did not sell any Lexmark stock in the year prior to the class period, he sold nearly 10,000 shares during the class period for a profit of over $600,000. *Id.* at ¶¶ 158–59.

Paragraphs 160–165 of the complaint address insider sales of non-defendants. Even assuming that such sales are relevant at all—and, for the record, the Court thinks they are not [6]—such "evidence" contributes little towards the creation of a "strong inference."

Plaintiffs devote the next several paragraphs of their "Scienter Allegations" section to their assertion that "[t]he insider trading also occurred at suspicious times." *Id.* at ¶¶ 166–70. In support of their contention, plaintiff note that defendants Curlander, Goodnight, and Mann along with several other non-defendants sold over $10 million worth of shares between April 23, 2001 and May 8, 2001. These time periods coincide with a press release plaintiffs deem to have been misleading and an annual shareholders meeting at which Curlander is alleged to have withheld damaging information about inventory build-up. The trades occurring during this time period priced at nearly $67 per share—a price not far from the class period high of $70.75. *Id.* at ¶¶ 166. Plaintiffs also note that two individual defendants (Morin and Mann) along with two other non-defendant insiders together sold over $11 million worth of Lexmark stock over a one-week period beginning five days after defendants filed an allegedly false and misleading Form 10–Q. *Id.* at ¶ 167. These sales were made at prices approximating the class-period high. Finally, plaintiffs point out a two-week period beginning August 14, 2001—the day after defendants filed another allegedly false and misleading Form 10–Q—during which defendants Curlander and Mann sold over $5.5 million worth of Lexmark stock. *Id.* at ¶ 168.

In the final two paragraphs of plaintiffs' "Scienter Allegations" section, plaintiffs allege—first—that [d]efendants' knowledge of the buildup of excess inventory, delivery problems with respect to a certain line of printers in the first quarter of 2001, the fact that a certain line of printers was unsaleable, and problematic Australian sales is evidenced by the recollections of unnamed Lexmark employees referenced earlier in the complaint. *Id.* at ¶ 169. Plaintiffs' final allegation is that "excess inventory was, in part, responsible for the gross profit margin pressure on the Company, and that Lexmark was trying to liquidate that inventory." *Id.* at ¶ 170.

III. Plaintiffs' Scienter Allegations Considered in Light of the PSLRA's Heightened Pleading Standard and Competing Inferences Proffered by Defendants

As discussed above in the section entitled "Pleading Scienter under the

---

6. *See, e.g., Plevy v. Haggerty,* 38 F.Supp.2d 816, 834 (C.D.Cal.1998) (finding the stock sales of insiders not named as defendants "irrelevant to alleging scienter against the five named defendants").

PSLRA," *supra* Part I, plaintiffs' scienter allegations are not entitled to the deference afforded allegations made for other causes of action, which are tested by the typical Rule 12(b)(6) motion to dismiss. To the contrary, unlike as is the case with garden-variety Rule 12(b)(6) motions, when considering motions to dismiss predicated on plaintiffs' alleged inability to meet the heightened pleading requirements of the PSLRA a court need not draw *every* inference in favor of plaintiffs. In determining whether plaintiffs have met their burden of raising a "strong inference" of scienter, courts *can* and *should* consider contrary inferences. The *Helwig* court itself noted that plaintiffs are entitled "only to the most plausible of competing inferences." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir.2001)(en banc).

In the instant case, defendants' briefs— in all relevant respects factually uncontested—provide a context to plaintiffs' allegations that puts plaintiffs' protestations in perspective. This larger context gives rise to competing inferences that, on balance, envelop plaintiffs' own inferences of scienter. Because plaintiffs are entitled "only to the most plausible of competing inferences," plaintiffs fall far short of establishing a "strong inference" of scienter "leav[ing] little doubt as to misconduct."

Plaintiffs' scienter allegations can be analogized to several strokes of a painting pattern that, considered alone, jump out at the eye. But the context provided by defendants amounts to, literally, the rest of the picture. When the rest of the picture is filled in and the painting is observed as a whole, plaintiffs' individual strokes are rendered no longer distinctive.

For example, it is true—as plaintiffs allege—that defendants Curlander, Morin,

Goodnight, and Mann sold over 350,000 shares of Lexmark stock during the April/May and August 2001 time-periods cited by plaintiffs in their complaint. It is also true that these sales grossed these defendants approximately $22 million. These numbers suggest a substantial sale.

But consider the larger context (i.e., the "rest of the picture"). *In point of fact, the amount of Lexmark stock sold by the individual defendants was dwarfed by the amount of stock that they continued to hold.*[7] Precisely, defendants collectively continued to hold throughout the class period some 89%—2,932,446—of their shares and vested stock options. What's more, the management defendants (all defendants save outside director Mann) collectively retained approximately 96%—1,220,201—of their aggregate saleable shares through the end of the class period. Plaintiffs' assertion that defendants sales were substantial—while numerically accurate— is misleading, then, for defendants gains ($27 million) pale in comparison to the decline in value of their retained holdings ($76 million). *In context*, then, to the extent plaintiffs rely on the volume and value of defendants' sales as a foundation for their scienter allegations, that reliance is misplaced.

Also providing valuable background is the historical fluctuation of Lexmark's stock price. In this respect, it is significant to note what this case is *not:* this is not a situation in which a struggling company witnesses its stock price suddenly soar only to have its senior officers and directors sell huge percentages of their overall holdings before the Company crashes back to earth. To the contrary, the mid-$60 range at which Lexmark's

---

7. For purposes of determining total holdings the Court finds it appropriate to consider both direct holdings and vested stock options. *See*

*Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 985–86 (9th Cir.1999).

stock traded in April and May of 2001 was but half the price at which it had traded a year earlier, when it traded at more than $130 per share in March of 2000 and closed above $100 per share from February 2 through May 5, 2000. Here too, plaintiffs' allegations, grounded in numbers, are misleading: while it is true that defendants traded at levels upwards of $70 per share during the class period, this number is not "high" when considered in context of Lexmark's historical stock price. Lexmark's historical stock price, then, also undercuts plaintiffs' inferences of scienter.

Finally—and perhaps most persuasively—any inference of scienter is undercut by the context of defendant Mann's stock sales. As noted above, Mann's stock sales accounted for over 90% of the stock sale proceeds at issue in this case. The merit of plaintiffs' scienter allegations with respect to Mann, then, are of particular interest.[8]

A close look at the context of Mann's stock sales exposes plaintiffs' scienter allegations as ill-founded. For one, far from "suspicious," Mann's stock sales seem perfectly reasonable in light of the impending expiration of many of his stock options. Specifically, Mann acquired more than 300,000 Lexmark shares in April, May, and August of 2001 by exercising options that were to expire on August 28, 2001. Also significant, Mann's class-period sales appear to be merely part of a larger plan to liquidate portions of his vast Lexmark stockholdings. Mann sold shares in February 2001—*prior* to the commencement of the class-period—at $52 per share, far below the class-period high. Such pre-class period sales support the inference that Mann's class-period sales were not "suspicious in timing."[9] Likewise, Mann's sales toward the end of and after the class period also support the inference that Mann's sales were part of a larger liquidation plan. For instance, Mann's August, 2001 sale was executed at a per-share price of less than $48—*approximately $4 per share lower than the price at which Mr. Mann had sold Company stock in February, 2001, prior to the class period.* Also, even on October 22, 2001—the last day of the class period and the day on which the Company's stock price fell after the announcement of the Restructuring Charges—Mr. Mann sold 150,000 shares at per-share prices ranging from $44–45. Mann, then, sold stock before, during, and after the class period—and generally at historical lows. This regular and unexceptional pattern of stock-sale activity signifi-

8. It should be noted that, as an initial matter, there is considerable debate whether Mr. Mann is a legitimate defendant in this action. As defendants are quick to point out, Mann is not alleged to have made any statements in the purportedly false or misleading March 29, 2002 Form 8–K, the April 23, 2001 earnings release or subsequent conference call, the April 26, 2001 annual shareholders meeting, the May 10, 2001 Form 10–Q, the July 23, 2001 earnings release and quarterly conference call, or the August 12, 2001 Form 10–Q. *Indeed, the single allegation against Mr. Mann is that he was one of 12 Lexmark directors who signed the Company's March 20, 2001 Form 10–K.* Because plaintiffs fail to allege that Mr. Mann participated in the day-to-day activities of Lexmark—or that he had a special relationship with the Company in connection with the Form 10–K—it is highly doubtful that he can be held liable. Though post-PSLRA law on this point is somewhat murky, it would seem that liability for federal securities fraud would require proof of more than merely a signature on a filing. To be clear, however: the Court's disposition of this matter assumes, but does not decide, that Mann is in fact a legitimate defendant.

9. *See, e.g., Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 283 n. 10 (D.Mass.1998) (noting that "evidence that officers sold shares prior to the class period can undermine a plaintiff's claim that insider sales during the class period were unusual").

cantly undermines—if not outright obliterates—plaintiffs' allegations of scienter (at least, with respect to Mann).

On balance, and in the final analysis, the context of defendants' contested stock sales negates any inference of scienter raised in plaintiffs' complaint. Defendants, in highlighting the "bigger picture," offer competing inferences that more than offset plaintiffs' own. As discussed, weighing competing inferences is an improper exercise for courts when addressing the typical Rule 12(b)(6) motion to dismiss. Such an exercise would be improper because, when considering motions filed under Rule 12(b)(6), all inferences are to be drawn in favor of plaintiffs. This is not so, however, where, as here, the PSLRA applies. Under the PSLRA, the pleading standard is heightened; a court is placed in the unusual role of balancing competing inferences.

### CONCLUSION

All told, plaintiffs "may raise a reasonable inference that defendants acted knowingly or recklessly, but they do not raise a *strong* inference." *In re Federal–Mogul Corp. Securities Litigation,* 166 F.Supp.2d 559, 564 (E.D.Mich.2001). For this reason, plaintiffs' Rule 10b–5 claim must fail. Because plaintiffs' § 20(a) claim is dependant on the 10b–5 claim, the § 20(a) claim also fails.

Accordingly,

**IT IS ORDERED** that defendants' motion to dismiss [Record No. 49] be, and the same hereby is, **GRANTED**.